JOYNES, J.
It has been contended for the appellant, that the contract out of which this suit arose is to be regarded as a lease of the land, slaves and other personal property therein mentioned, for an annual rent; and that as the right to the services of the slaves has been lost by *their emancipation, the appellant is entitled to an apportionment of the rent, upon the principles of the case of Newton v. Wilson, 3 Hen. & Munf. 470. Eor the ap-pellee it has been contended, that the appellant has no right to claim an apportionment, even if the contract is to be regarded as a lease and the annual payment as a rent. This position involves an objection to the ground on which the decision in Newton v. Wilson was placed. It is said that that was a case of eviction by title paramount, and that the decision should have been placed on that ground, which, it is argued, has no application to the present case. ' Eor the appellant it is argued, on the other hand, that for the purposes of this case, the emancipation of the slaves had the effect of an eviction by title paramount. But it is further contended for the appellee, that the contract was really a sale, and the annual payments a purchase money, payable in annual instalments during the life of the appellee, the amount of the purchase money being thus made dependent upon the duration of the appellee’s life. Thus regarding the contract, the counsel for the appellee insisted, that it is like an ordinary sale of slaves, in which he insisted that the agreed price must be paid, notwithstanding the loss of the slaves by their emancipation.
In the view which I take of the case, it is not necessary to decide either of these questions, and I therefore express no opinion upon either of them. They are important questions, which ought not to be decided until the3’ are directly presented.
The facts of the case are, in substance, that, under the will of Richard M. Scott, Sr., Richard M. Scott, Jr., the second, the testator of the appellant, was entitled to the St. Marysville plantation, with the slaves, stock and other personal property upon it, subject to a life estate in Eliza D. Scott, the appellee, given to her by the same will, and held in trust for her by *575 William H. Ritzhugh. This life ^estate intercepted the possession and enjoyment of the property by Richard M. Scott, Jr., the second. He was naturally desirous to extinguish it, so as to get the possession and control of his property. To accomplish that object, and at the same time to secure to Mrs. Scott the benefit of her life estate, he entered into a contract with Ritzhugh, the trustee, by which Ritz-hugh relinquished to him the possession and enjoyment of the whole property, real and personal; and he agreed, in consideration thereof, to pay to Ritzhugh as trustee a certain annual sum during the life of Mrs. Scott, and pay all taxes and legal charges on the said property. This was the substance of the arrangement, though not the form of it. In form it purported to be a lease by Ritzhugh’ to Scott during the life of Mrs. Scott, and the annual payment was called a rent, for the recovery of which the usual remedies were reserved in case the tenant should make default in payment. There was no covenant by the trustee for title or for quiet enjoyment, nor was there any restriction upon Richard M. Scott as to the use or disposition of the property. No reversion was left in the trustee or in Mrs. Scott.
The claim now set up is not founded upon any express stipulation in the contract. We must look, therefore, to the character and objects of the contract, to ascertain whether an3" stipulation can reasonably be implied as incident to it, upon which the claim of the appellant can be sustained.
The contract W'as, in effect, what is known in technical language as a surrender. A surrender is defined to be a ‘ ‘yielding up of an estate for life or years to him that hath the immediate reversion or remainder, wherein the particular estate may merge or drown by mutual agreement between them.” 2 Black. Com. 326. A surrender differs from an assignment. An assignment of an estate for life or for years is a transfer of the whole interest of *the assignor to some one other than the immediate reversioner or remain-derman holding an estate which is larger than that of the assignor. The estate assigned remains as an estate distinct from that of the reversioner or remainderman, and vests in the assignee, who stands, for most purposes, in the shoes of the assignor. But when the transfer of the whole interest in an estate for life or for years is made, as in this case, to the person holding the immediate reversion or remainder in fee, the estate transferred is extinguished by merger, and the transfer operates as a surrender. As there was no deed in this case, the contract not being under seal, it was not a case, as to the land, of express surrender, because, under our statute, a deed is necessary to convey a life estate in land by surrender as well as in other cases. But the contract was an agreement for a surrender, which was carried into effect by the parties by the delivery of possession and the payment of money under it, and it had, therefore, all the legal effect of an express surrender by deed. Taylor on Landlord and Tenant, $$ 507-509. As to the personal property, no deed was necessary.
The effect of the arrangement, therefore, was to extinguish the life estate of Mrs. Scott, which intercepted the enjoyment of the property by Richard M. Scott, whereby he became invested with the possession of the property, and with an absolute and unencumbered title to it as owner. Less than this would not have effected the objects which Richard M. Scott probably had in view. Looking at the relative situations of the parties, their respective rights under the will of Richard M. Scott, Sr., and the language of the contract, it is obvious that Richard M. Scott had two objects in view: 1. To get the possession of his property; and, 2. To get the unrestricted right to control and use it as he might see fit. Ror these purposes, it was necessary that the encumbrance of Mrs. *Scott’s title should be removed entirely out of the way. A lease would not have accomplished these objects. It would have given him the possession of the property, but not the right to use and control it as owner. And it was doubtless understood by the parties that the effect of the arrangement was wholly to extinguish the title of Mrs. Scott, by substituting the annual payments under the contract for the rents and profits under the will, and to give to Richard M. Scott unrestricted control of the property as owner. Ror it appears from the letter exhibited with the bill, that Mrs. Scott proposed to Richard M. Scott to purchase one of the slaves embraced in the contract, and that he declined the proposition, saying that none of his slaves were for sale. Mrs. Scott also says, in her deposition, that she has understood that Richard M. Scott had sold some of the slaves before their emancipation, which, if not true, might and probably would have been disproved.
The reservation to the trustee of the usual remedies for the recovery of the annual payments in rent does not affect the view which I take of the substance and effect of this contract. It is a settled principle of the common law, that where a lease is made of lands and chattels, reserving a sum in gross as rent, though the rent is greater by reason of the chattels, it is regarded as issuing out of the land alone. Spencer’s case, 5 Rep. 16; Newman v. Anderton, 2 New Rep. 224. And so far has this principle been carried, that it has been held, that if the lessee is evicted of the land, the rent is gone, and there can be no apportionment in respect of the goods. Emolt v. Cole, Dyer R. 212, Marg.; Ritchburg Cotton Manufacturing Company v. Melvin, 15 Mass. R. 268; Woodfal Land. & Ten. 284.
The remedies reserved, therefore, were, as they could only be, remedies in respect to the land. They were: *1. The right to distrain; and, 2. The right to re-enter upon default of payment. But these would create no lien on the land, nor restrict the right of Richard M. Scott to *576 make sale of it. Their utmost effect would be to render the purchaser of the land from Richard M. Scott liable as assignee, upon the covenants of the lease. Whether that would be so in this case, it is not material to enquire. But these remedies for enforcing pajment of the rent would have no sort of effect upon the slaves or other personal property. They might, like any other personal property belonging to Richard M. Scott, be distrained for the rent, if found upon the land, but not otherwise.
Such being, in my view, the object and effect of this contract as understood by the parties, I do not think that there is any ground upon which the claim of the appellant can be sustained. There has been no failure of the consideration upon which Richard M. Scott contracted to make the annual payments. The consideration was the extinguishment of the claim of Mrs. Scott, which operated as an encumbrance on his property and an impediment to his enjoyment of it; and that has been fully accomplished. There is no ground to imply an agreement on the part of Mrs. Scott to relinquish any part of her claim in case of the loss of the slaves by emancipation or otherwise, without eviction by title paramount, if indeed she could be held bound to do so in case of such an eviction. Richard M. ■ Scott did not consider himself as buying or hiring the slaves from Mrs. Scott, and whatever arguments would apply to the case of a sale or a hiring of slaves, as to which I express no opinion, they can have no just application to this case, as I understand it. The object of Richard M. Scott was not to acquire a title from Mrs. Scott. The transaction implies no reliance upon her for reimbursement in case he should lose any part of the property, even if it can be said to imply any reliance upon her for *the goodness of the title under which she held her life estate. If his title was good, hers was good, and I think the fair inference is, that he took the risk of her title, which was really carved out of his own. Rooking at the real character and object of the transaction, I think the present case is substantially the same as if Mrs. Scott had held a mortgage on the slaves, executed by Richard M. Scott, Sr., or had been entitled to an annuity charged upon them by the will of said Richard M. Scott, Sr., and Richard' M. Scott, Jr., the second, had relieved the slaves from the encumbrance by giving •other security for the payment of the debt ■or annuity.
The case is not altered by the fact that this is a suit in equity. The claim of the appellee is founded upon the contract, and she came into equity only because there was no trustee who could enforce the contract at law. It is not a case, therefore, for the application of the maxim that he who asks equity must do equity. Gilliatt v. Rynch, 2 Reigh 535. And besides, this does not appear to be a case of hardship in which a court of equity would fell disposed to give relief by the application of that maxim. It seems, from the evidence, that the.annual sum to be paid to Mrs. Scott was fixed at a low rate, and that the land and fisheries are worth the whole of it.
I think the decree should be affirmed, the appellant having waived all objection on the ground that the decree embraces a sum not due when the suit was brought.
MONCURE, P.
I do not know that there is anything in the opinion of my brother Joynes in this case from which I would dissent, and had I seen that opinion before I wrote my own, I might have concurred in it, and thus saved myself the trouble of writing one. But I wrote my opinion during the last term, while his was not written until a few days ago. There is nothing in his which *is in conflict with anything in mine; and as I still entertain the same opinion, I will therefore proceed to deliver it as it is written. The counsel for the appellant maintained, that the contract in the proceedings mentioned was a lease for life by a tenant for life to the remainderman of land, slaves and other property, and that the lessee was entitled to an apportionment of the rent on account of the loss of the slaves during the term by the effect of the war. In my opinion I endeavor to show, that even if he were right in maintaining that the contract was a lease, he would be wrong in his conclusion that there ought to be an apportionment of the rent; but I then proceed to say, that I think, the contract was an assignment or sale, and not a lease, and I endeavor to show that, a fortiori, there ought to be no such apportionment. My' brother Joynes views the contract neither as a lease nor as a sale; but as a surrender. I have no fault to find with that view. I consider the effect of a sale and surrender in regard to this case as precisely the same. Every surrender for value is in effect a sale; or, perhaps, more properly speaking, is the consequence of a sale. A sale by a particular tenant to the remainderman amounts to a surrender, and operates a merger of the term, unless there be some good cause for the continued separation of the term and the remainder. Whether there be such cause in this case or not, I deem it immaterial to enquire, as, in my view, it is wholly immaterial whether the contract be considered a sale or a surrender. With this preliminary explanation, which I thought to be due to myself, I proceed with my opinion :
If in this case Mrs. Eliza D. Scott, the appellee, had been the fee-simple owner of the St. Marysville estate, with all the slaves and other personalty thereto attached, and had leased the whole for her life to Richard M. Scott, the testator of the appellant, at an annual rent of seven hundred dollars, covenanted to be paid by the lessee without ^condition or exception, I would still have been of opinion that the lessee was entitled to no abatement of the rent on account of the loss of the slaves from /the effects of the war; and this upon the principle of the English *577 decisions, which show, that “on an express j covenant to pay rent during the term, an action may be maintained for the whole rent stipulated tobe paid, and for the whole time, notwithstanding there may be a fire which burns down houses on the leased premises, and deprives the lessee of the enjoyment thereof for part of the term.” 2 Rob. Pr. new ed. p. 52, citing Paradine v. Jane, Alleyn 27; Monk v. Cooper, 2 Str. R. 763; 2 Ld. Raym. R. 1477; Belfour v. Weston, 1 T. R. 310; and it seems that “the same rule has been acted on in a case wherein the agreement has not been by deed—Baker v. Holtpzaffell, 4 Taunt. R. 45—and it matters not whether there is an' agreement in writing for a term of years, or only a tenancy from year to year. ” Izon v. Gorton, &c., 5 Bing. N. C. 501; 35 E. C. L. R. 198; 2 Rob. Pr. supra. This rule has been found fault with by judges, as well in England as in this country, and we find that great Judge Lord Horthington saying: “The justice of the case is so clear that a man should not pay rent for what he cannot enjoy, and that occasioned by an accident which he did not undertake to stand to,” and he was “much surprised it should be looked upon as so clear a thing that there should be no defence to such an action at law; and that such a case as this should not be considered as much an eviction as if it had been an eviction of title; for,” said he, “the destruction of the house is the destruction of the thing. ’’ Brown v. Quilter, Amb. R. 621. But McDonald, C. B., questioned whether there is any real resemblance in such a case to that of an eviction of the tenant by title paramount to which Lord Horthington had assimilated it. “The tenant,” says this Chief Baron, ¡ “can only be evicted where the title of the '^landlord was originally bad, where he never had in truth anything to demise, and the pretending to do so was a fraud upon the lessee. In the present case, there was a full capacity to demise the thing leased on any terms which the parties might agree upon. The possibility of destruction by fire was in their contemplation In making the lease; and it would have been very easy to provide against the payment of rent in such an event, or for apportioning the rent on a partial loss, if such had been the intention of the parties; on the contrary, the lessee has expressly stipulated to pay the rent during the term at all events, and it is very difficult to say that that was not the intention.” Hare v. Groves, &c., 3 Anstr. R. 693, 4 ; 698; 2 Rob. Pr. supra, from which the above quotations are taken. The reason of the rule is thus clearly and strongly stated by the Chief Baron, and seems to commend itself to our understanding and approbation, and I can certainly see nothing unjust or objectionable in it. The rule has stood the test of time and innovation in England, and remains, I believe, to this day, the law of that country. However it may have been changed or modified by adjudication or legislation in some of our sister States, if j ¡ such be the fact, it has been, and yet is, the settled and approved law of our State. In Ross v. Overton, 3 Call 309, the lessee of a mill,having covenanted, in addition to the rents reserved, to make certain improvements and deliver the mill with such improvements at the end of his term in proper tenantable repair, and the mill during the lease having been destroyed by the ice, three arbitrators, to whom the matter was referred, awarded that the lessee should pay the rents, notwithstanding the destruction of the mill, and should perform the other covenants contained in the lease; and the Court of Appeals expressed an opinion that the arbitrators did not mistake the law. In the half century which has elapsed since this award, (as is *well said in 2 Rob. Pr. p. 54,) no attempt has been made to change or explain the law. On the contrary, in the revision of 1849, the revisors proposed to the Legislature the adoption of the following as the fourteenth section of chapter 117 of the Code:
“ l 14. Ho covenant or promise by a lessee to pay the rent, or that he will leave the premises in good repair, shall have the effect, if the buildings thereon are destroyed by fire or otherwise without fault or negligence on his part, of binding him to make such payment or erect such buildings again, unless there be other words, showing it to be the intent of the parties that he should be so bound. But in case of such destruction, there shall be a reasonable reduction of the rent for such time as may elapse until there be again upon the premises buildings of as much value to the tenant for his purposes as what may have been so destroyed.”
And the revisors strongly sustained this recommendation by a lengthy note appended to their report, page —, in which they referred to several American cases in which the wisdom of the rule had been questioned. The section as thus proposed by them was not adopted by the Legislature, but was altered by the committee on revision, and as so altered was adopted and embodied in the Code as $ 19, ch. 117, in the following words:
‘ ‘Ho covenant or promise by a lessee, that he will leave the premises in good repair, shall have the effect, if the buildings are destroyed by fire or otherwise without fault or negligence on his part, of binding him to erect such buildings again, unless there be other words showing it to be the intent of the parties that he should be so bound.”
The Legislature thus adopted the suggestion of the revisors as to the obligation of the lessee to re-erect buildings destroyed by fire or otherwise, without fault or negligence on his part, under a general covenant or promise to *leave the premises in good repair, but rejected their recommendation in regard to his obligation to pay the full amount of the rent in case of such destruction under a general covenant or promise to pay the rent. This action and non-action of the
*578 Legislature seem to me to give to the rule in question, which had been so long established bj' the courts, almost the force and effect of statutory law. Whether the rule were a wise one in its origin or not, it seems to me that it would be unwise to alter it after it has so long received the sanction of our courts, and still more so to alter it after it has received the sanction of the Legislature. If it be altered at all, it ought to be altered not by the courts, but by the Legislature. The maxim stare de-cisis strongly applies, and gives to the rule the nature of a law. It has received the commendation of some of our most distinguished jurists. Chancellor Kent, in speaking of it, says: “But I apprehend that the law,' as it is now settled on that point, rests on solid foundations of justice and policy. It is to be observed that the case only applies to express agreements to pay; and if a party will voluntarily create a duty or charge upon himself, he ought to abide by it when the other party is'not in fault, and when he might have provided, if he had chosen, against his responsibility in case of such accidents. The loss of the rent must fall either on the lessor or lessee; and there is no more equity that the landlord should bear it than the tenant, when the tenant has engaged expressly to pay the rent, and when the landlord must bear the loss of the property destroyed.” 3 Kent 467, marg. Judge Tucker vindicates the rule in terms of like import. 2 Tuck. Com. book 2, ch. 3, p. 32. And Judge Allen, in his opinion in Thompson v. Pen-dell, 12 Leigh S91, in which Judge Stanard concurred, says in regard to it: “The hardship is more apparent than real, and the rule may be vindicated upon considerations both of justice and *good policy. ’ ’ The reason of the rule in its origin is, that a covenant to pay rent, generally, is intended to bind the covenantor to pay the whole rent, notwithstanding the demised subject or part of it may be destroyed by fire or otherwise during the term; and that if the parties intend to make any exception, they ought to do so expressly in the lease. Whatever may be said of the soundness of this reason for the rule in its origin, it certainly derives greatly augmented force from the fact that the rule has been long sanctioned by the courts, and still more from the fact that it has been approved by the Legislature. When parties make a lease in the present state of the law containing a general covenant for the payment of the rent, without condition or exception, they must be presumed to intend that the lessee shall be bound for the whole rent, notwithstanding the destruction of the demised subject, or part of it, by fire or otherwise during the term, without the fault of the lessor; and to give to the covenant a different effect would, it seems to me, be to alter the contract of the parties.
The same rule prevails in equity as at law on this subject; for courts of equity have no more right than courts of law to change the contracts of parties. 18 Ves. 115; Leeds v. Cheetham, 1 Sim. R. 146, 2 Cond. Eng. Ch. R. 74; Gates v. Green, 4 Paige’s R. 355. In Leeds v. Cheetham, the Master of the Rolls, after stating the rule of law, proceeds to say: ‘ ‘It appears to me that in this respect equity must follow the law. The plaintiff might have provided in the'lease for a suspension of the rent in case of accident by fire; but not having done so, a court of equity cannot supply that provision which he has omitted to make for himself; and it must be intended that the purpose of the parties was according to the legal effect of the contract.” And in Gates v. Green, Chancellor Wal-worth, while he complained of the rule as being against natural *law and equity, yet considered it well settled, and that “a lessee of premises which are burned, has no relief against an express covenant to pay the rent, either at law or in equity, unless he has protected himself by a stipulation in the lease, or the landlord has covenanted to re-build.” The case of Mason, &c. v. Moyers, 2 Rob. 606, relied on by the counsel for the appellant, is not at all in conflict with what has been said or the cases before referred to. The tenant was relieved in equity in that case, because he had been prevented by the landlord’s own act from fully enjoying -the use of the demised premises, and was therefore clearly entitled to an abatement of the rent. The only question was, whether his remedy was at law or in equity, and it was held that, under the peculiar circumstances of the case, he might be relieved in equity.
But though personalty may be rented with land, yet the rent issues out of the land and not out of the personalty, so that if the personalty be lost without the fault of the landlord, or from a cause for which he is not responsible, there seems to be no good reason why the tenant should not be bound for the whole rent, even though the loss may have occurred without his fault. All of the land out of which alone the rent issues still remains in the possession of the tenant, and his obligation to pay the entire rent would seem to continue also. The’first case we have on this subject was one of this kind; of which we have the following account in 3 Kent’s Com. 465, marg.: “In Tavernor’s case, (1 Dyer, 5, 8, b,) which arose in 34 and 35 Hen. VIII, a man made a lease of land, and of a flock of sheep, rendering a certain rent, and all the sheep died. The question was, whether the tenant could have relief from this calamity, at the expense of the landlord, by an apportionment of the rent. It was very much debated, and different opinions were entertained by the sergeants and judges who discussed the subject. Some of them thought *there was good reason and equity to apportion the rent', or in other words, to make a proportional deduction for the loss of the sheep. But others held to the contrary opinion, and that though the sea, or an inundation, should gain upon the land, or part of it be burnt by wild fire, the entire rent must issue out *579 of the remainder, and that it -would he different if part of the land should be recovered from the tenant by a title paramount to that derived from his landlord. The point was left unsettled by this early decision ; but the opinion of those who were for the payment of the entire rent g-ained a decided superiority in the course of the subsequent century.” And the learned commentator then proceeds to give us an account of the case of Paradine v. Jane, Aleyn, 26, and other subsequent cases, which result in establishing the rule that “a tenant is not excused from the payment of rent, when he is deprived, even by inevitable necessity or misfortune, and without any default on his part, or on the part of his landlord, of the enjoyment of the premises. ’ ’ Id. 465-468, marg. Now it will be observed that in Tavernor’s case no distinction was taken by counsel or court, between the effect of a loss of real and personal estate, upon the obligation of the tenant to pay the entire rent, where both are included in one demise. And it was evidently conceded in that case, and has never been denied in any subsequent case, that the same rule applies to both in this respect. Indeed, the rule would seem to apply a fortiori to personal estate, since the rent is supposed to issue out of the realty, though that may be a mere technicality.
The case of Newton v. Wilson, 3 Hen. & Mun. 470, so much relied on by the counsel for the appellant, is not at all in conflict with what has been said. That was a plain case for relief on well settled principles, independently of the rule aforesaid. There the lease embraced land and a mill with a negro miller. The miller had been emancipated *by the lessor before the execution of the lease, and during the tgrm left the service of the lessee. That the lessee should have been held liable to continue to pay for the service of the negro after it had been lost, as if by title paramount and by the fault, if not the fraud of the lessor, would have been contrary to one of the plainest principles of law. Every sale of personal property in the possession of the vendor, whether such sale be absolute or for a limited term only, implies a warranty of title in the absence of anything in the contract of sale to the contrary; and when the vendee loses the property by reason of want of title in the vendor at the time of the sale, he has a plain recourse over against the vendor on the implied warranty aforesaid, and may defend himself to the extent of his loss against the claim of the vendor for the purchase money. It was properly held, therefore, in Newton v. Wilson, that the tenant was entitled to an abatement of the rent on account of his loss of the services of the miller. But that is a very different case from one in which the loss of personalty included in a demise occurs without the fault of the lessor, and without any breach of contract on his part. He stands in regard to such property precisely as he would if it had been sold or hired for a term to the lessee, by itself and without being connected with the land, for a sum payable in instalments during the term, as rent is usually paid. The only difference between the two cases being, that in one the, purchase money or hire is incorporated with the rent as part thereof, and in the other it is unconnected with any rent. But this difference cannot affect the rights of the parties. Now suppose that the appellee, instead of renting the whole subject to the lessee, had hired the slaves to him for her life, for an annual sum payable during her life; would he have been discharged from his obligation to paj' these sums accordingly, in whole oi* in part, by the loss of the slaves, or any of them during *the term without her fault? Could it make any difference that the purchase money thus payable is called hire instead of purchase money in the contract? Is not this mere matter of form, instead of substance? It has never been held that in such a case the vendee or lessee would be discharged as aforesaid. It is true that in George v. Elliot, 2 Hen. & Mun. 1, it was held by Chancellor Taylor, that if a slave who is hired for a. year be sick or run away, the tenant must nevertheless pay the hire; but if the slave die, without any fault of the tenant, the owner and not the tenant should lose the hire from the death of the slave, unless otherwise agreed upon. But there never has been a decision to that effect by this court, and the latter branch of it seems to be opposed to the principle which has been acted on in analogous cases ; and is contrary to a decision of the Court of Appeals of Kentucky, in which the opinion of Chancellor Taylor was referred to and disapproved, and it was held that the hirer of a slave for a year, which died before the expiration of the year, was not entitled on that account to relief, even in equity, from his express undertaking, fairly and lawfully made, to pay the amount of the hire. Harrison v. Murrell, 5 Monr. R. 359. The decision of Chancellor Taylor seems always to have been acquiesced in in this State, since it was pronounced in 1806, and whether right or wrong originally, it ought not now to be disturbed ; because contracts have been subsequently made in reference to it as a correct exposition of the law', and it has thus become, in effect, a part of such contracts. But its operation ought to be confined to just such a case as was then before the court, and not to be further extended. It would therefore apply to the very common case of slaves hired by the year, but not to the extraordinary case of slaves sold or hired for a long term of years or a lifetime.
In order that we may better understand the rule in '^question, it may be well for us to look a little more to the reason of it. It will be found to be not at all in conflict with the contract of the parties; but, on the contrary, it consists with and pursues their contract, express or implied. I find the reason of the rule nowhere better explained than by Baron Parke, in *580 Hart v. Windsor, 12 Mees. & Weis. 68, 85: “Considering this case,” says he, “without reference to the modern authorities, which are said to be at variance, it is clear from the word ‘demise,’ in a lease under seal, the law implies a covenant; in a lease not under seal, a contract for title to the estate merely — that is, for quiet enjoyment against the lessor and all that come in under him by title, and against others claiming by title paramount during the term; and the word ‘ let, ’ or any equivalent words which constitute a lease, have no doubt the same effect, but not more. There is no authority for saying that these words imply a contract for any particular state of the property at the time of the demise, and there are many which clearly show that there is no implied contract that the property shall continue fit for the purpose for which it is demised, as the tenant can neither maintain an action, nor is he exonerated from the payment of rent, if the house demised is blown down or destroyed by fire, or gained upon by the sea, or the occupation' rendered impracticable by the King’s enemies, or where a wharf demised was swept away by the Thames. In all these cases the estate of the lessor continues, and that is all the lessor impliedly warrants.” Now here we have a full and clear explanation of this whole subject — a touchstone to which all the cases may be brought to ascertain their correctness in principle. The lessor undertakes, either expressly or by implication, that he is entitled to the estate which he professes to demise, and will not disturb the lessee in the enjoyment of it during the term, consequently he undertakes that the lessee shall not be evicted either by himself *or by any person claiming under him, or by title paramount; but he does not undertake that the lessee shall not lose the property, or any part of it, by the act of God, or “the King’s enemies,” or any other cause not proceeding in whole or in part from any act or default of the lessor. In the language of Chancellor Kent, “it is well settled, that upon an express contract to pay rent, the loss of the premises by fire, or inundation, or external violence, will not exempt the party from his obligation to pay the rent.” 3 Com. 466. If such exemption be contemplated or intended by the parties, their intention should be expressed in the lease, and not being expressed, it will be implied that such was not their intention. To hold the lessee to be exempt in such a case, would be to interpolate a term in the contract.
Having thus ascertained the rule and the reason of it, I now proceed to the application of it to this case. I think it plainly applies to the case, and that the lessee (if lessee he can be called) is not exempt from the payment of any part of the rent (if rent it can be called) by reason of the loss of the slaves included in the demise from the effects of the war. It is not pretended that the supposed lessor was not entitled to the slaves for her life at the time of the demise, or had not a perfect right to convey them for her life to the lessee, or that she or any person claiming under her has disturbed the lessee in his quiet and peaceful enjoyment of them, or that the cause of the loss, in whole or in part, proceeded from any act or default of hers. Why, then, does not the case stand precisely on the same ground as if the slaves had all perished during the term by cholera or other disease? or had run away to Canada or some free state, and thus been lost? In such a case certainly the lessee would not, on that account, be exempt from the payment of any part of the rent; and this I understand to be admitted by the counsel for the ^appellant. But whether admitted or not, such I think is the settled law. The parties knew that the slaves were perishable, and that some or all of them might, at any time, die or run away, or otherwise cease to be slaves. That some of them would die during the life of the lessor was a very probable fact. That some of them might run away, and thus become free, was not at all improbable. They lived on the Potomac river, near the border of the free States, where the facilities of escape were very great and often made available for that purpose. It was possible, though not so probable, that the slaves might all be swept off bj cholera or other epidemic, or might cease to be slaves by the effects of the war or the action of the government. The property, in its nature, was subject to many and peculiar perils. But all these perils were known to the parties, and the risk of all was assumed and encountered by the lessee, in binding himself to pay an annual sum for the estate, without condition or exception. The counsel for the plaintiff in error argues, that the loss in this case stands on the same principle of a loss by title paramount. But in this I think he is clearly mistaken. When the loss is by title paramount the lessor at the time of making the lease had not the title which he undertook to convey, and thus he violates his implied warranty, if he does not actually commit a fraud. But here the lessor, at the time of the lease, had a perfect title for life to the slaves, recognized and assured by both of the governments, State and Federal, under which she lived; and that they have since ceased to be slaves is certainly not her fault. The loss in this case stands on the same principle of a loss by the act of God or “the King’s enemies” —both of which stand on the same footing in this respect. In the leading case on this subject, Paradme v. Jane, an action of debt was brought for rent upon a lease for years, and the defendant pleaded, by way of excuse for the non-payment *of the rent, that he had been driven from the premises by public enemies, viz., by Prince Rupert and his soldiers. But Rolle, J., overruled the plea, and held that neither the hostile army nor an inundation would exempt the tenant from paying rent. The principle extends to every case in which the cause of the loss is an act of force or power *581 —vis major — which cannot be controlled or resisted; and such is the case here, whether the loss proceeded from the effect of war or the action of government.
I have thus far been considering the case as if it were a lease for life by a person entitled to the fee-simple estate. But let us now view it as it really is, a contract between a person entitled to a life estate and the remainderman for the purpose of transferring and surrendering'the life estate to the remainderman in consideration of an annual sum to be paid by the latter to the former. The counsel for the defendant in error contended, that the contract in this caséis an assignment, and not a lease, and therefore the testator of the plaintiff in error was not in fact a lessee, but a purchaser, of the life estate, not for a gross sum to be sure, but for purchase money to be paid in the form of an annuity for life. And in support of this view, he referred to Archbold’s law of L/andlord and Tenant, p. 69, S3 Law Library 85, in which it is said that an assignment “differs from a lease in this, that by a lease a lessor grants an interest less than his own, reserving to himself a reversion; but by an assignment, he parts with the whole property. If a man convey the whole of his interest by deed, it is an assignment, not a lease, although by the deed he reserves rent to himself, and the deed contain covenants which are not in the original lease or conveyance to him. ’ ’ This view seems to be correct, and if so, it seems to be conclusive of the case; for surely a purchaser of property, which is afterwards lost without the *fault of the vendor, has no recourse against the latter, unless there be some stipulation in the contract of sale which gives such recourse. In answer to this view, the counsel for the plaintiff in error referred to the case of Michie v. Lawrence, 5 Rand. 571, in which it was held that no set form of words is necessary to constitute a lease; and a contract between two persons that one should have, during the life of the other, land, negroes, &c., he paying therefor a stipulated annual sum, is not a sale, but a lease. That case came precisely within the description of a lease as laid down by Archbold, in giving the distinction between an assignment and a lease, as already stated. Wood, the lessor in that case, was owner of the fee, and granted an interest less than her own, to wit, an estate for her life to the lessee Michie, reserving to herself the reversion. The annual sum to be paid was not in terms called “rent” in the contract, but that made no difference ; the court said the contract was in substance a lease, and such was clearly the intention of the parties. Here the appellee had only a life estate in the property, and that she conveyed to the remainderman, reserving no reversion to herself. And though the purchase money is payable in annual sums for her life, which is called rent, yet that makes no difference. As in the case of Michie v. Lawrence, we must look at the substance, and not the form, of the thing, and the contract is in substance an assignment, and such was clearly the intention of the parties. That such was their intention, I think conclusively appears from the relation of the parties, the objects they had in view, and all the circumstances of the case. Many years ago Richard M. Scott, the elder, late of Bush Hill, in the county of Fairfax, devised and bequeathed his estate of St. Marysville, with slaves and other personalty thereto attached, in the county of Stafford, subject however to an annual rent of two hundred dollars reserved to *the testator and his heirs, to trustees for the use of Richard M. Scott, son of the appellee, during his life, and then for the use of the appel-lee during her life, with remainder in fee to Richard M. Scott, son of the said testator Richard M. Scott, and testator of the appellant. William H. Fitzhugh, one of the trustees, alone accepted the trust, and received and held the estate, and applied the rents and profits, after paying the rent of two hundred dollars reserved thereon as aforesaid, to the use of the first beneficiary, Richard M. Scott, during his life, and then to the use of the second beneficiary, the appellee, until the 30th day of August, 1850, when the contract of that date was entered into between the said trustee and the re-mainderman, the testator of the appellant, whereby the former conveyed or, as it is said, leased to the latter all the property aforesaid from and after the 1st day of January, 1851, for and during the life of the appellee, for an annual sum, or rent as it is called, of nine hundred dollars, out of which was to be paid to the party entitled thereto the said reserved annual rent of two hundred dollars; leaving the annual sum of seven hundred dollars to be paid and applied to the use of the appellee during her life. And by the said contract it was further stipulated, that the grantee or tenant was to pay all taxes and legal charges against the said estate, and that the trustee should be entitled to the usual remedies for the recovery of the rent, in case the tenant should at any time be in default.
Row it is obvious, from the relation of the parties and their respective interests in the property, and the nature of the property itself, that it was the intention of the parties by this arrangement to merge the particular estate in the remainder, to invest the remainderman with the entire fee-simple estate, and place him in the immediate possession and control of the property, to do with the same as he might think proper ; and at the same time to secure to *the appellee a certain annuity for life instead of a claim to uncertain rents and profits. That such was the intention, is plainly indicated by the contract itself, which recites, that “whereas the said Richard M. Scott, who at the death of the said Elizabeth D. Scott will be entitled in reversion, and the said William H. Fitz-hugh, trustee as aforesaid, have agreed that it will promote the interest of the said Richard M. Scott, and render secure and *582 certain the interest of Elizabeth D. Scott, that the said Richard M. Scott should obtain possession of the estate both real and personal.” And the same intention is just as plainly indicated by the decree of the Circuit Court of Stafford made in June, 1852, in a suit in which the said E. D. Scott was plaintiff and the said W._ H. Eitzhugh and others were defendants,’ to which it seems the said R. M. Scott, testator of the appellant, was a party; by which decree the said contract or lease was, by consent of said plaintiff and said Eitzhugh, confirmed; and after reciting that the “whole trust subject being in the possession of the person who is entitled thereto in remainder after the death of the plaintiff under the said will, and is also entitled to it during the^life of the plaintiff under the said lease, subject to the rents and covenants therein reserved and contained, and who, without the intervention of a trustee, can (pay and apportion the rents to and among the parties entitled thereto, the said person being himself, entitled (as is believed,) to the annual sum of $200 charged upon the said subject in the will of the said testator, and the plaintiff) who is entitled to the residue of the rent reserved in said lease, being willing to look to the tenant therefor and not to the said Eitzhugh ; the court, by like consent,. accepted the resignation of said Eitzhugh as trustee and discharged him from the further execution of the trust, and declared the plaintiff to be thenceforth entitled to *receive the rent reserved by the said lease, and which might thereafter accrue, after deducting the said annual sum of $200, and that she might, at her. own costs and charges, sue for the same, if necessary, in the name of the said Fitzhugh. It is true that the contract or lease declares “the said W. H. Eitzhugh, trustee, to be entitled to the usual remedies for the recovery of the rent in case the tenant, shall at any time be in default, ’ and thus seems to reserve the remedy by distress for the so-called rent, and to make it in effect a rent charge. But whether this be so or not cannot affect the question as to the right of apportionment of the rent. The only object of the charge, if it be one, was to benefit the vendor and secure the payment of the money, not to injure him. There can be no doubt but that the parties, in graduating and fixing the amount of the rent or annuity to be received by the appel-lee, made all due allowances for all the risks to which the property, from its nature and situation, was exposed, and agreed upon an annual sum which at all events was intended to be paid to the appellee. Such would appear to be the fact from the apparent disparity between the yearly value of the property as proved by the only evidence in the record, and the amount of the said annual sum. It was doubtless not contemplated by either party that property in slaves was in any immediate danger of the complete annihilation which afterwards happened to it; but still, that was one of the risks which the vendee encountered. Nor can there be any doubt but that it was intended by the arrangement aforesaid to give to the vendee or lessee aforesaid, whichever he may be called, the right to dispose of the property at his pleasure, and thus to sell it if he chose, from and after the date of the contract, or rather the 1st day of January thereafter, when it was to go into effect. The land, of course, would remain subject *to the charge for the security of the. rent, if any such charge was created thereon. But certainly the slaves were subject to no such charge, unless they happened to be on the land, and therefore liable to be distrained for the rent thereafter in arrear, like any other property of the vendee or lessee or his assigns thereon. It does not appear what has been done with the land, slaves, or other property since the execution of the contract. On this subject the record is very meagre of facts. The land may have been long since sold, and some of the slaves also. The only evidence on the subject which the record afEords is the deposition of the appellee taken in October, 1865, in which she states that she had been informed by others that the appellant had sold some of the slaves, but she could not state anything in regard thereto from her personal knowledge. She was a non-resident of the State, and therefore, probably, had no' personal knowledge. It may be said that this is hearsay evidence, and therefore not admissible; though it was not excepted to, and probably would have been disproved if the fact had been otherwise and had been deemed material. I think the substance of the contract was a sale for an annuity for life instead of a gross sum; and • that if it was intended by the parties to make the annuity a rent charge on the property, the only effect of it was to give the annuitant an additional security, and not to subject him to risks which would otherwise devolve on the vendee.
In regard to the objection taken to the lease as not being under seal, the original lease has been lost, together with all the papers in the suit in Stafford. But it is recited in the decree in that suit as having been by deed; and if the testator of the appellant was a party to that suit, as we must take him to have been, he is bound by the proceedings in that suit. But even if it were not *under seal, it is a binding contract in a court of equity where the parties now are.
The last assignment of errors was withdrawn in the argument, and need not be further noticed.
I am of opinion to affirm the decree.
RIVES, J., concurred in the opinion of Joynes, J.
Decree affirmed.